Davis, Judge,
concurring in the result:
I do not join in the court’s opinion because, first, of the apparent holding that retention of the equipment involved here would have violated the Espionage Act even if the items were all unclassified, and, second, of the wholly unnecessary reliance on the “use warranty”. I concur in the judgment because the items were in fact classified and, that being so, plaintiff is entitled, under our prior decision in this case, 153 Ct. Cl. 550, 289 F. 2d 651 (1961), to recover only what he paid.
I have the gravest doubt that the controlling provision of the Espionage Act (now 18 U.S.C. §793) could ever apply to surplus materials or equipment which the armed services sold after properly declassifying or failing to classify them. The crucial fact of declassification (or initial failure to classify) would seem to show, in itself, that the purchaser need not fear that he would trespass on the Act by keeping the goods. This is a serious criminal provision and we must be very cautious in extending it to surplus *712 items which the public (including the purchaser) has been told, in effect, by the Defense Department need not be kept from unfriendly hands and eyes but may be revealed to all.
It is unnecessary, however, to decide that point since the equipment here was actually classified (as the court also holds, correctly but alternatively). The trial commissioner has found the items classified and I see no adequate reason for rejecting that factual conclusion. Plaintiff has made much of a listing (“46ACX”) said to show that one of the major pieces of equipment was unclassified, but I am not at all persuaded that this listing applied to any of the goods involved in this case. There is no testimony to that effect; there are apparent divergences from the particular equipment before us; and there is considerable affirmative testimony that the items sold to plaintiff were in fact classified and never removed from that category.
As for the “use warranty”, our earlier decision must have decided that that clause was inapplicable — the issue was distinctly raised at that time, see 153 Ct. Cl. at 553, 289 F. 2d at 653 — since the court held, implicitly, that if the equipment did not relate to the national defense the plaintiff could receive market value, not merely his expenditures. If the “use warranty” limited recovery, whatever the event, to the plaintiff’s costs (which the defendant was even then willing to pay), there would be no need for an elaborate trial; the case could and would have been disposed of by summary judgment five years ago in 1961. Under the law of the case, therefore, the “use warranty” is irrelevant. It is also irrelevant because the court specifically held in 1961, without any reliance on the “use warranty”, that, if the property turned out to be related to national defense (within the meaning of the Espionage Act), the plaintiff was entitled to “a refund of his direct out-of-pocket expenditures in the abortive transaction.” 153 Ct. Cl. at 556, 289 F. 2d at 655. That is exactly what the court awards today.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, 'and the briefs and argument of counsel, makes findings of fact as follows:
*713 i
BusiNess Arrangements Between Plaintiff and Dubin Electronics Company, Inc.
1. During the period 1946 through 1950, defendant held public sales of quantities of surplus electronic and radar equipment. Defendant generally advertised these sales to various dealers in surplus property, through mailing lists maintained by various government agencies and in newspapers such as the Government Surplus Sales Record or the Government Daily. These advertisements invited prospective purchasers to attend the sales, examine the goods and bid thereon. During the year 1950, dealers in surplus property were mailed notices of sales by the government announcing sales of surplus property, including airborne radar equipment, and soliciting offers to bid on the equipment.
2. Generally the goods offered for sale were in mixed lots containing several different types of equipment. Usually one sample of each type of equipment in the mixed lot was open for inspection by dealers. Purchasers were not permitted to test the equipment prior to purchase and did not know whether it would work. The government did not warrant that surplus property would perform any particular function or that it would be operable.
3. Plaintiff’s younger brother, Lester Dubin, had been in the business of purchasing surplus electronic equipment from defendant and its agencies, individually, and later as president of Dubin Electronics Company, Inc. (sometimes hereinafter referred to as “Dubin Electronics”), Corona, New York, from 1946 through 1950, and he had attended a number of sales of surplus property held by defendant or its agencies during this period.
4. During the period 1946 through 1950, Dubin Electronics Company resold surplus electronic equipment by means of advertisements placed in various trade journals of the electronics trade. The company also sent descriptive, direct mail advertisements to government laboratories, industrial firms, colleges and universities, and to individuals. Various laboratories of the United States Navy were included in the *714 list of addresses to which Dubin Electronics Company regularly sent direct mail advertisements. The advertisements published and circulated by Dubin Electronics produced purchase orders for the goods advertised, from industrial organizations and government agencies, without prior examination of the equipment by the purchasers. Companies which ordered goods from the company on this basis included, inter alia, Western Electric Company, liadio Corporation of America, Bell Laboratories, Westinghouse, Bendix, Hughes Air Craft, and International Business Machines.
5. Plaintiff had been in the grocery business for a number of years prior to 1950; however, he sold his grocery business and was unemployed immediately before the time he purchased the surplus equipment involved in this suit. Early in 1950, plaintiff’s brother, Lester Dubin (mentioned in finding 8, supra), suggested to plaintiff that he purchase some surplus material and try to develop a surplus property business. Sometime prior to July 1950, plaintiff entered into an arrangement with Lester Dubin whereby the latter agreed to advise plaintiff as to surplus property he might purchase and the prices to pay for it. It was agreed that Dubin Electronics would act as sales agent for plaintiff in reselling surplus property purchased by plaintiff and would incorporate descriptions thereof in its direct mail advertising bulletins. Plaintiff was told he would have to rent warehouse space in which to store goods after purchase and prior to resale. Dubin Electronics Company was to receive one-third of the sales price as compensation for the advisory services of Lester Dubin and for acting as sales and advertising agent for plaintiff.
6. Prior to July 5, 1950, the 862d Air Force Specialized Depot, Wilmington Pike, Dayton 10, Ohio, circularized a notice that a public lot sale of approximately 50 lots of surplus electronics equipment, described as Sale No. UI-51-I, would be conducted at said depot, from July 5, 1950 through July 11,1950. A copy of that notice was received by Lester Dubin and he showed it to plaintiff. Prior to July 12, 1950, the United States Air Force, pursuant to the provisions of the Federal Property and Administrative Services Act of 1949, *715 notified the United States Navy of the proposed surplus sale. That notice included information concerning the proposed sale of the Mark 31 Model 1 and Mark 1 Model 2 equipments here in issue. The Navy, informed of the impending sale as required by said Act, supra, indicated no requirements by the Navy for said equipment. There is no evidence in the record that the Navy made any effort to prevent the Air Force from selling the equipment here involved.
7. Early in July 1950, plaintiff and Lester Dubin proceeded together from New York to the site of the surplus sale being held by the Air Force at Dayton, Ohio. The equipment the Air Force offered for sale was piled on an open field covering many acres. The equipment was divided into lots, each on a separate part of the field, and samples of each significant type of equipment in each lot had been taken out of their packages which permitted examination of the samples by prospective bidders. Plaintiff and Lester Dubin were permitted to, and did, examine various of the lots of property offered for sale. They ascertained the condition of the equipment and identified it. Other potential bidders made similar examinations of the lots of property on the grounds.
8. One lot of the surplus property equipment offered for sale by the Air Force was designated as Lot No. 23. This lot contained certain electronic equipment, described as Mark 31 Model 1 and Mark 1 Model 2 equipment, as well as additional equipment, including AN/APG-13B scaNnur MOUNTS. Potential bidders freely examined the equipment in Lot No. 23. The boxes in Lot No. 23 which contained the Mark 31 Model 1 equipment bore markings of those numbers. The boxes containing the Mark 1 Model 2 devices also bore the markings “Manufactured by General Electric U.S. Navy Type CG-46ACX.” None of these boxes bore any markings indicating that the contents were classified. The samples of the devices also bore markings on name plates affixed to the equipment. The Mark 31 Model 1 devices were so marked on the name plates. Other devices also had name plates affixed bearing the markings “United States Navy Type CG-46ACX manufactured by General *716 Electric,” and Mark 1 Model 2. Various of the tubes in each of these devices bore tube numbers. No markings appeared on the devices indicating they were classified.
9. After examining Lot No. 23 and other lots, Lester Dubin advised plaintiff to enter certain bids for certain of the lots. In accordance with this suggestion, plaintiff submitted sealed bids for six different lots, including Lot No. 23, on a government bid form provided for this purpose. The bidding form both invited and urged all bidders to inspect the property to be sold prior to submitting bids. It also authorized the Air Force salvage officer to reject all bids which did not represent the best interests of the United States.
Purchase AND Identification of Equipments
10. (a) Plaintiff was the high and successful bidder for four lots, including Lot No. 23, which is the only lot material to this case. On July 12, 1950, plaintiff and J. E. Adams, Contracting Officer of the 862d Air Force Specialized Depot, Dayton, Ohio, acting on behalf of the government, signed Contract No. AF 33 (149) s-139 for sale of “surplus electronic material” under which plaintiff purchased, for a total consideration of $3,162.62, the property contained in “Lot No. 23', consisting of radar domes and cable.”[1] The contract contains, inter alia, the following provision: “This contract is authorized by Public Law 152-81st Congress.”[2]
(b) Plaintiff’s contract of sale contains, inter alia, the folio wing provision:
Article 14. Use warranty. — The purchaser represents and warrants that it will use or consume the property covered hereby in the United States for manufacturing, construction, maintenance, or repair purposes, and the purchaser agrees that if it does not use or consume any of the items, it will not resell them at a profit.
11. The equipment actually contained in Lot No. 23, purchased by plaintiff under Contract No. AF33 (149) s-139 (finding 10(a), supra), consisted of 83 Mark 31 Model 1, “S” Band radar transmitter-receiver units; 136 Mark 1 *717 Model 2, “S” Band radar receivers, type CG-46ACX; a number of AN/APG-13B scanner mounts; ID-108/APS-15-T1 radar indicators; AN/APG-13 inverters; ASB antennas; and some other equipment.[3] The Mark 31 Model 1, “S” Band radar transmitter-receiver units and the Mark 1 Model 2, “S” Band radar receivers had been purchased from the Navy by the United States Army Signal Corps, Signal Depot, Dayton, Ohio, during 1944. The equipment was shipped directly from the contractor’s plant to Dayton, Ohio.
12. The equipment contained in Lot No. 23 was shipped from Dayton, Ohio, on July 12 and 13,1950, and arrived in New York on or about July 30,1950.
13. During the course of the sale at which plaintiff purchased Lot No. 23, Lester Dubin met on the sales ground one Selati who represented Fair Radio Sales, located at 132 South Main Street, Lima, Ohio. Selati advised Lester Dubin that he had a complementary piece of equipment to the Mark 31 Model 1 equipment. Lester Dubin asked Selati to send to him in New York a sample of such accessory equipment and Selati did so. This complementary equipment was known as PU/Mark 31 Power Supply Unit. After examining the sample of said power supply unit, Lester Dubin retained it and, on August 8, 1950, purchased on behalf of plaintiff, from Fair Radio Sales, eighty additional PU/Mark 31 Power Supply Units for $20.00 each, or a total price of $1,600. As a result of the above-mentioned business transaction, it appears that plaintiff became the owner of eighty-one of said power units at a total cost of $1,600, as there is no evidence that he paid for the sample unit.
14. On August 10, 1950, Dubin Electronics purchased one sample of a dynamotor power unit, 13-volt DC, from Western International Co., 45 Yesey Street, New York, New York, for $15.00. This power unit had a name plate with the marking “CG-211078”. It was purchased under an arrangement whereby an additional 135 of these same units could be ordered by plaintiff as he might require as accessory units for the 136 Mark 1 Model 2, radar receivers purchased by him.
*718 Advertisement for Sale of Equipments
15. In the latter part of July 1950, Lester Dubin prepared an advertising bulletin entitled “Bulletin 83A”,[4] for the purpose of offering the goods contained in Lot No. 23, and other goods, for sale to Dubin Electronics customers, potential and existing. The bulletin contained photographs and brief descriptions of the Mark 31 Model 1 and the Mark 1 Model 2 equipments purchased from the Air Force, and descriptions of the PU/Mark 31 power supply units purchased from Fair Kadio Sales, and the dynamotor power unit purchased from Western International Company. The Mark 31 Model 1, “S” Band radar equipment depicted in the upper lefthand corner of Bulletin 83A (ibid.), together with its power supply, is the radar guidance and homing system of the bat missile.[5] All of these items were offered for sale at prices indicated. In reselling surplus property to the public it was the common practice of surplus property dealers to offer equipment for sale by means of descriptive advertisements similar to Dubin Electronics Bulletin 83A. In some cases these descriptions had the price of the equipments set next to them. The sales price of each of the equipments advertised in Bulletin 83A and owned by plaintiff was set forth opposite the description of the particular equipment. These prices were set by Lester Dubin in his capacity as sales agent for plaintiff.
16. In early August 1950, the mailing list of Dubin Electronics for its direct mail advertisements contained the names of about 30,000 persons and organizations. Prior to August 11,1950, Federal Letter Service of New York printed about 30,000 copies of Bulletin 83A. Approximately 11,000 copies were circulated to potential customers of Dubin Electronics Company between the first mailing on August 11, 1950, and August 16, 1950.
17. Sometime subsequent to August 11,1950, Bulletin 83A, in which Dubin Electronics advertised for sale the equipment *719 involved herein, came to the attention of certain officials in the Burean of Aeronautics, Department of the Navy, who requested the Third Naval District, New York City, New York, to stop all sales of said equipment, locate any items that had been sold, and conduct an investigation of the matter.
Notice to Plaintiff Not To Sell Equipment
18. About August 16, 1950, the Department of the Navy notified Dubin Electronics Company, Inc., to cease mailing Bulletin 83A and not to sell the equipment described as Mark 31 Model 1, and Mark 1 Model 2, and associated power supplies, because these were classified equipments. This was the first time that plaintiff or his agents learned that the defendant or any of its departments had any objection to plaintiff selling any of the articles contained in Lot No. 23. Plaintiff and his agents complied immediately with the Navy’s request to cease mailings of Bulletin 83A and not to sell any of the Mark 31 Model 1, and Mark 1 Model 2 equipments. Shortly after the Navy Department sent said notice, it notified plaintiff’s agent that there was a security violation involved and that the Navy intended to seize the equipment. Prior to August 16,1950, none of these equipments had been sold by the plaintiff.
19. On August 18, 1950, the Bureau of Aeronautics, Department of the Navy, informed the Third Naval District, New York City, New York, that it had positively identified the units offered for sale as bat missile units, and requested their repossession. On August 19,1950, the Bureau of Aeronautics informed the said District that the Mark 31 Model 1, “S” Band radar equipment and the Mark 31 power supply constituted a unit which was then classified “Confidential,” and further informed said District that the material involved related to the national defense within the meaning of the Espionage Act, 18 U.S.C. § 793. On August 22, 1950, the Director of Naval Intelligence notified the District Intelligence Officer, Third Naval District, that the Mark 1 Model 2, “S” Band radar receiver advertised- in Dubin Electronics’ Bulletin 83A was then classified “Restricted.”
*720 Seizure oe EquxpmeNTs
20. On August 19,1950, officials of the United States Navy took from Dubin Electronics Company, Inc., 83 Mark 31 Model 1, “S” Band radar transmitter-receiver units, which were new and contained in the original cartons, and one 26% volt PU/Mark 31 power unit, all of which equipment had been manufactured by Western Electric Company for the Navy, under Contract NOrd 4810. Said transmitter-receivers were part of the property contained in Lot No. 23 purchased by plaintiff from the Air Force at Dayton, Ohio. The power unit was purchased by plaintiff from the Fair Eadio Sales Company. On August 23,1950, the Navy picked up from Dubin Electronics, 80 26% volt PU/Mark 31 power units contained in their original cartons which had been manufactured by Westem Electric Company for the Navy under Contract NOrd 4810. These power units also were purchased by plaintiff from the Fair Eadio Sales Company. On August 24, 1950, the Navy picked up from Dubin Electronics, 136 radar receivers, Mark 1 Model 2, “S” Band, Navy type CG-46ACX, in their original containers and one dyna-motor power unit, Navy type CG-211078, in its original container, manufactured by General Electric Company under Contract NOrd 965. Said receivers were part of the property contained in Lot No. 23. The power unit was purchased by plaintiff from Western International Company. Prior to taking the above-identified equipment, official representatives of the Navy Department told Lester Dubin that possession of the equipment might constitute a violation of the Espionage Act,[6] and that if plaintiff did not cooperate with the Navy in its efforts to repossess the equipment, a Federal Judge would issue a warrant for its seizure. The Korean conflict was then in progress and both Lester Dubin and plaintiff were concerned over the possibility of their being charged with violation of the Espionage Act.
21. Signed receipts were given by the Navy Department for the equipment taken from plaintiff on August 19, 24 and 25, 1950. Each of the receipts showed plaintiff’s separate *721 source of title for each, type of equipment taken from bis possession, and stated that the goods were taken by direction of Naval authorities; that the taking was without prejudice to plaintiff’s rights, including his full right of compensation; and that the property was taken without requirement of service of a warrant or other process.
DispositioN or Equipments Seized
22. The 83 Mark 31 Model 1 equipments and the 81 PÚ/ Mark 31 power supply units repossessed by the Navy Department were destroyed on March 28, 1952, 'at the New York Naval Shipyard. The 136 Mark 1 Model 2 equipments, also designated CG-46ACX, were sent to the United States Naval Supply Depot at Mechanicsburg, Pennsylvania, shortly after they were repossessed by the Navy Department. The equipments were stored at this place as classified material until they, along with three other of such equipments not taken from plaintiff, were destroyed by mutilation. The one dyna-motor power unit taken from the plaintiff was included in a total of 259 identical power units which were reported “Loss By Survey” on a government form (1148M), dated September 30, 1960.
All of the equipment taken from plaintiff by the Navy was treated, after seizure, in accordance with Navy Eegulations applicable to classified information.
General Nature op the Equipment
23. Eadar is an electronic device for detecting an object by determining its range, its position at azimuth, and sometimes its physical characteristics. A radar system accomplishes this detection by emitting from its transmitter a series of pulses of electrical energy, called a beam or signal, which vary in width and area covered, depending upon the type of antenna employed to transmit the signal. When the beam strikes an object, a portion of the beam is reflected back towards the transmitter of the energy. There the reflected energy is picked up by the antenna of the radar system and sampled by an instrument known as a receiver. The receiver contains circuits which enable it to discriminate the range *722 of the target from the transmitter by noting the delay from the time that the signal emanated from the transmitter until it was reflected back to the receiver. Another circuit in the radar receiver examines the signal strength of the reflected beam and thereby determines if the target is moving and its direction. The emission of the electronic beam from the transmitter is known as “illuminating” the target. All radar sets have the common function of ranging. All are designed to receive a signal from a target and by precise measurement of that signal, determine the range and bearing of the target. Some radars also have equipment to transmit the signal to the target as well as receive it back.
The PelicaN Missile System
24. In 1943 and 1944, a “seeker” or guidance system known as the “Pelican” missile was in the development state. Such a system enables a missile to “home” on a target by taking signals received and translating them into such a form that the missile is directed to fly toward a particular target. The Pelican was the first radar homing missile developed by the United States Navy. The radar portion of the Pelican missile did not contain a transmitter for illuminating a target. Therefore, the Pelican was known as a semi-active, or passive, homing missile; that is, it contained a receiver but no transmitter; it homed on its target by using radar signals emitted by a transmitter carried in an associated aircraft. A radar system which had its own self-contained transmitter was known as an active or self-illuminating type radar. The device described as the “Mark 1 Model 2, Radar Receiver, manufactured by General Electric. U.S. Navy type CG-46ACX * * *,” depicted in the upper righthand portion of Bulletin 88A (Defendant’s Exhibit No. 1), prepared and circulated by Dubin Electronics Company (findings 15 and 16, supra), was one of the three design versions of the receiver for the radar guidance system of the Pelican missile.
25. The Dynamotor Power Unit, CG-211078, for the Mark 1 Model 2 radar receiver, described in the upper right-hand portion of Dubin Electronics Bulletin 83A, was the power supply for the radar receiver of the Pelican missile. (See finding 15, supra.)
*723 26. (a) While the record is not entirely clear, it appears that pursuant to approved recommendations of proper Naval officials, production on certain radar guided missile projects, including the Pelican project, was terminated sometime late in 1944, “except for such experimental purposes as appear desirable.”
(b) The record as a whole supports the conclusion that the use of parts of the three versions of the Mark 1 radar receiver, i.e., Models 1, 2 and 3, subsequently known as SWOD, Mark 1, used in the guidance system for the Pelican missile, particularly the basic designs of the circuitry in these three different models of the receiver unit, was continued by the government in connection with experimental work, research design and engineering relating to various guided missile projects that were either continued, or initiated, by the Navy, and possibly other branches of the Defense Department, during the period 1944 through August 1950.
The Bat Missile System
27. (a) After the Navy discontinued operational production of the Pelican missile late in 1944, the Navy concentrated its efforts to ready a missile known as the “Bat” (on which some initial development work was being carried on at least as early as 1941) for use as a combat weapon. The Bat was an air-to-surf ace type of homing missile. The Bat carried its own transmitter, so it was independent of an associated aircraft. The Bat was a radar controlled glide bomb; but the guidance system of the Bat was not, strictly speaking, a radar. It was a “missile seeker” which transmitted its own radar signal to a target and then used the reflected signal to guide itself to the target. The missile’s nose contained both a radar transmitter and a receiver. The receiver’s circuits indicated the direction of the target and electrically flashed its findings to the glider’s autopilot, thereby permitting the missile to change course to track a moving target. While the Bat and the Pelican missile radar systems were designed to perform the same result, i.e., guide a glider bomb to its target, the natural advantage that the Bat had over the Pelican was that the Bat had its own self-contained transmitter to illuminate the target, whereas the *724 Pelican could only home on its target by having the mother plane continue in with it close to the target to provide illumination.
(b) While it may be said that commercial radar available to the general public in 1950 and units of the missile seeker here in issue operated on the same basic radar laws applicable at that time, both the Pelican and Bat equipments contained a number of elements not found in commercial radar or on the commercial market; and the function and special characteristics of those homing devices were unknown to the general public during the year 1950.
(c) The device pictured in the upper lefthand portion of Dubin Electronics Company Bulletin 83A, and described as the Mark 31 Model 1, was the radar “S” Band radar equipment, guidance and homing system for the Bat missile. (See finding 15, supra.)
28. The radar system of the Bat missile had its own independent power supply. The PU/Mark 31 power supply unit, described in the upper lefthand portion of Dubin Electronics’ Bulletin 83A, was the power supply for the radar homing head device system of the Bat missile. (See finding-15, supra.)
Similarity or Circuitry nsr PelicaN aNd Bat Missile Radar Systems
29. The receiver portion of the Pelican and Bat radar missile systems worked in the same manner and performed the same functions. While there were differences in the physical configurations of the two receivers, each contained electronic circuitry which, on receiving a signal reflected from the target, provided a method for presenting the information to a servo mechanism (not a part of the radar system) which, in turn, operated the control surface of the glider’s airframe causing it to change course to home on the target. These circuits, known as tracking circuits, were identical in the radar systems of both the Pelican and the Bat missiles.
*725 Navy Security Regulations — Classification of Defense INFORMATION
30. (a) When used in connection with the subject of “security”, the term “classification” means a decision made by proper authority in the Department of Defense to put a piece of defense information or material into a specific category that then makes it subject to the current regulations regarding safeguarding and dissemination. Information or material which must be safeguarded in the public interest is classified matter. It follows, therefore, that a decision by proper authority to place particular information or equipment in a classified status also is a decision that such information or equipment bears a certain relationship to the national defense. Items of information and material are classified on the basis of their relative use, capability, and the current state of the art. Up to sometime in 1953, there were four classifications, namely, Top Secret, Secret, Confidential, and Restricted. In 1953 the classification of “Restricted” was discontinued, and the other three said classifications have remained to the present time. Declassified information and material need not be safeguarded in the public interest as relating to the national defense. Prior to 1953, the Navy employed the four above-stated classifications and used the same basic principles and procedures for classifying and declassifying of information and material.
(b) The official originating a piece of information or equipment is responsible for assigning a classification to that information or equipment. The originator is the first classification authority. Only a senior in command over the originator can change the classification of an item which has been classified. Once information or equipment has been classified, it cannot be reclassified or downgraded without the issuance of a written instruction, signed by the originator or his senior within the chain of command. Information classified by one agency cannot be changed by any other agency without the permission of the originating agency.
(c) When a piece of material contains classified information, unless it is inappropriate to do so, it must be marked with its assigned classification grade. It does not appear *726 from the record that the equipment in issue was so marked. Notwithstanding the marking requirement that prevails under normal circumstances, some classified material or equipment is not so marked, when it is considered inappropriate for this to be done. Where classified material is not marked, the only evidence of classification is a required piece of paper stating the security classification of the information revealed by the equipment.
(d) Classification is designed to protect an idea or a piece of equipment, relative to its defense application. Information can be revealed either by a document or an object and the purpose of the classification system is to safeguard information from becoming known to potential enemies of the United States in the interest of national defense. Classification is not directly concerned with classifying physical objects, but only attempts to protect the information which these objects could convey. Theoretically, even information which is within the public domain might be classified by the Armed Services, including information published in a newspaper, or in a trade journal. For example, an article appearing in the New York Times, which is then clipped out and removed, might be classified.
JaNaf Series oe Publications
31. (a) There was received in evidence the so-called JANAP (Joint Army Navy Air Force Publication) series of publications, identified as janap 140(A), dated November 1948 (Defendant’s Exhibit 24), and the following supplements thereto: janap 140(A)-3, dated February 1950 (Defendant’s Exhibit 25); 140 (A)-4, dated August 1950 (Defendant’s Exhibit 26); and 140 (A)-5, dated April 1951 (Defendant’s Exhibit 27). The above-identified documents are described as “Security Classifications of Electronic Equipment,” and were approved and published by authority of the Joint Chiefs of Staff, Joint Communications — Electronics Committee, Washington, D.C. Each of those publications was marked “Original,” “Nonregistered” and “Restricted.”
(b) Page vii, entitled “Introduction,” of janap 140(A) (Defendant’s Exhibit 24), supra, states that the document *727 lists the official security classification assigned to all items of electronic equipment by the Army, Navy and Air Force prior to June 1,1948; that it supersedes prior publications; and that “Many unclassified items of equipment that have been cancelled or declared obsolete have not been included herein.”
The data in this publication is divided into five sections, the following three of which are considered by plaintiff to be relevant to this action: Type numbered items having Joint Army-Navy Nomenclature, Navy Model Letter and Type Number System, and Electron Tubes. Each section contains a columnar display of information listing data concerning equipments by number, letter, or number and letter combinations, as follows: (1) Type number; (2) Item name; (3) Security classification; and (4) Cognizant agency.
In the Security Classification Column, the following key is used for security classification: “S: Secret, C: Confidential, E: Eestricted, and U: Unclassified.” The Security gradings shown for the section where the type number is based upon Navy Type Model Letter and Type Number System, supra, apply not only to the equipment itself which is listed in the document, but also to the following matters, inter dlw, relating to the equipment: (1) Specifications which include technical and performance details; (2) Special techniques and/or frequencies; (3) Circuit diagrams and drawings ; and (4) Installation drawings which disclose information on the internal construction and design principles.
Paragraph 11 of said Introduction states that “Comments concerning corrections, additions, or changes should be addressed to the Communications — Electronics Nomenclature Working group at the Pentagon, Washington, D.C.” The above statement appears in all of the other janaf publications mentioned, supra.
(c) Appendix D of jastap 140(A), entitled “Explanation of the Navy Type Designation System,” supra, reads in pertinent part:
Navy type designations are assigned to denote major units and also to most component parts likely to require replacement during the normal life of the equipment involved. * * *
*728 Navy type designations for equipment are either a numerical system or an alphabetical system. In the numerical system the equipment is designated by Navy type number (e.g., 21426) and a group of prefix letters to indicate the manufacturer of the item (e.g., CG). Once prefix letters are assigned to a manufacturer, the same designating prefix letters remain the permanent identification of that manufacturer and precede the Navy type numbers of all equipment produced by that manufacturer. The alphabetical system of Navy type designations is used for units peculiar to radar equipments. The alphabetical system is the same as the numerical system except that the last three or four digits of the Navy type number are replaced with alphabetical letters. (E.g., if equipment 21426 was a radar equipment, it would be designated 21ABC, and the particular equipment would be preceded by the manufacturer’s prefix letters, viz. CG-21ABC.) The fundamental principles governing the application of both systems of Navy type designations are the same.
32. Defendant’s Exhibits 25, 26 and 27 (finding 31(a), supra) are supplements to Defendant’s Exhibit 24 (ibid.) and ar.e designed to be used in connection therewith. Items in these supplements evidence changes, including additions and deletions, in the classification of equipment listed in Defendant’s Exhibit 24 through February 1951. Thus, Defendant’s Exhibit 25 covered such changes through January 16, 1950; Defendant’s Exhibit 26 covered such changes through August 1,1950; and Defendant’s Exhibit 27 covered such changes through February 1, 1951.
33. The Joint Communications-Electronics Committee of the Joint Chiefs of Staff that published the jaNap series of documents (findings 31 and 32, supra) was composed of representatives of the several branches of the Armed Forces within the Department of Defense. It is reasonably clear that all divisions concerned with electronic equipment within each of the military departments in the Department of Defense made submissions to the committee, either directly or through the working groups thereof, for compilation and agreement on the current classification of each piece of equipment listed in the documents prior to their publication.
34. The jaNap series of documents is a quick and ready *729 reference used by the Department of Defense to determine what classification has been assigned to particular materia] by the originator thereof. The security officer and personnel in the Classification Office of the Bureau of Naval Weapons, Department of the Navy, use these documents when questions arise as to the proper security classification of equipment not under said Bureau. The series has the full force and effect of multi-department regulations of the Department of Defense. However, the documents do not actually classify or declassify the equipments and information contained therein.
35. (a) The Mark 1 Model 2, “S” Band radar equipment taken from plaintiff’s possession by the Navy Department is not listed in the janap series of publications (Defendant’s Exhibits 24, 25, 26 and 27- — see finding 31(a), supra) as electronics equipment subject to any security classification, under the nomenclature “Mark 1 Model 2.” On page 462 of JANAP 140-A, dated November 1948 (Defendant’s Exhibit 24 — ibid.), there is listed an unclassified item of equipment described as “radio receiver,” type “46ACX,” with the cognizant bureau shown as being the Bureau of Ordnance. None of the other publications in the janap series (Defendant’s Exhibits 25, 26 and 27, ibid.) contain listings for the “46 ACX” nomenclature which shows that there was no change in the unclassified status of that particular equipment from June 1,1948 through February 1,1951. The janap series of documents, supra, does not list equipment designated “CG-46ACX.”
(b) The record does not support a finding that the equipment designated as type “46ACX” is the same as the equipment listed on Defendant’s Exhibit 1, supra, as the Mark 1 Model 2, radar receiver, manufactured by the General Electric Company “U.S. Navy Type CG-46ACX.” There is no probative evidence connecting the 46ACX equipment listed in janap, 140(A), dated November 1948 (Defendant’s Exhibit 24), supra, with the equipment purchased by plaintiff.
(c) It is a fact that under date of August 16, 1943, the Chief of the Bureau of Ships sent a letter (classified “Confidential”) to the General Electric Company, Bridgeport, Connecticut, that refers to “Badio — Contract NOrd-965 for *730 Eadio Deceiver Mark 1 Mod ( ) [no model number appears in this space] — General Electric Company, Schenectady, New York, Contractor * * and assigns Bureau of Ships Navy type designations to certain items including, inter alia, type designation “CG-46ACX” to a “Eadio Ee-ceiver,” and type designation “CG-211078” to a Dynamotor Power unit described therein which it appears from note references in said letter are related to the radio receiver as accessory equipment.[7] It also is true that the first two prefix letters “CG” in the Navy type designation stood for the manufacturer, General Electric Company, and were on the radar receivers seized by the Navy Department, and that in 1944 the prefix letters “CG” associated with Navy type designations were the designation for the General Electric Company as the manufacturer of the equipment. However, it should be noted that no prefix letters appeared in connection with the listing on page 462 of Defendant’s Exhibit 24, supra, of the radio receiver, design type “46ACX,” and the manufacturer of NOrd type 46ACX equipment cannot be determined from that listing. Therefore, it cannot be concluded that such equipment is the same as the equipment assigned Navy type designation “CG-46ACX,” because other companies may have manufactured “46ACX equipment” which possibly was similar to, but not necessarily identical with, equipment type designated CG-46ACX. Furthermore, the record will not support a finding that the equipments referred to in the Bureau of Ships letters, supra, retained said nomenclatures throughout their existence during the experimental periods that continued through August 1950. On the contrary, considering the record as a whole, it is found that the equipment depicted in Defendant’s Exhibit No. 1 as the Mark 1 Model 2 radar receiver (see findings 15 and 24, supra) was a radar receiver sub-system of the Pelican Missile system which was manufactured by the General Electric Company and became known as “SWOD Mark 1, Model 2,” and that the latter designation was the proper one for the equipment depicted in Defendant’s Exhibit No. 1, as the Mark 1 Model 2 radar receiver. On page 406 of Defendant’s Exhibit No. 24 (see finding 31 (a), supra) *731 there is listed a number of models of equipment, including, inter alia, equipment named “SWOD Mark 1 Mod 2,”[8] which is shown as being stamped Restricted and under the cognizance of the Bureau of Ordnance.
38. The accessory Dynamotor Power unit, type CG-211078, for the Mark 1 Model 2 radar receiver, is not listed, in an identifiable manner, in the JANAP series of publications (Defendant’s Exhibits 24, 25, 26 and 27 — finding 31(a), supra) as electronic equipment subject to any security classification. However, the foregoing fact is an insufficient basis for concluding that said power unit was not classified during the period prior to June 1, 1948 through February 1, 1951. There are a number of possible reasons why the power unit was not included in the series, eg., typographical error, inadvertent or deliberate omission, transfer of the material from the Navy to the Army; but it is unnecessary to make speculative findings with respect to the reasons why the unit is not listed because the record clearly shows that it was an integral part of the Mark 1 Model 2 radar system which, as a whole, including the power supply, was originally classified equipment and remained classified beyond August 1950. Furthermore, as indicated in finding 34, supra, the jaNáp series is simply a ready reference source used to quickly determine what classification, if any, has been assigned to a particular piece of equipment, and there are many reasons why certain equipment is not included in the compilation.
37. (a) Neither the Mark 31 Model 1, “S” Band radar equipment, nor the accessory PU/Mark 31 power supply unit therefor, are listed in the JANAP series of publications (Defendant’s Exhibits 24, 25,26 and 27, supra) under those respective nomenclatures. However, for reasons similar to those set forth in finding 38, infra, the foregoing fact is an insufficient basis for concluding that said radar equipment and power unit were not classified during the period prior to June 1,1948 through February 1,1951.
(b) The record shows that the Mark 31 Model 1, “S” Band equipment, supra, was the radar guidance system for the Bat missile (see finding 27, supra) ; that one version of the *732 Bat namely, the “Bat-0,” was known by the nomenclature “ASM-N-1”; that another version of the Bat, namely the “Bat-1,” was known as “ASM-2”; that the B'aJt also was described under its Army-Navy classification as the “AN/ DPN-1.” Type “AN/DPN-1” and type “AN/DPN-2” radar sets are listed on page 27 of Defendant’s Exhibit 24, supra, and are shown as being classified Confidential in November 1948. Defendant’s Exhibits 25, 26 and 27, supra, do not contain listings of equipment identified by the nomenclature AN/DPN-1 or AN/DPN-2; therefore, it may be reasonably assumed, in the absence of other evidence to the contrary, that said types of equipment remained classified Confidential beyond August 1950.
(c) The record also shows that the PIT/Mark 31 power supply unit, supra, was the accessory power unit for the Mark 31 Model 1, “S” Band radar equipment, supra, and that said power unit was an integral part of the Mark 31 Model 1 guidance system equipment which, as a whole, including the power supply, was originally classified material and remained classified beyond August 1950.
38. None of the tubes included as component parts of the Mark 31 Model 1 guidance system equipment device, the PU/ Mark 31 power supply units accessory thereto, or the Mark 1 Model 2 radar receivers, Navy type CGMfiACX, are listed in Defendant’s Exhibits 24, 25, 26 or 27, supra, as tubes subject to any security classification. Four of the tubes in the Bat missile equipments, including types “721-A,” “1B29,” “726-A,” and type “2J39” which was the magnetron of the Bat radar, are listed in Defendant’s Exhibit 24 as “unclassified” items. Two of the tubes in the Pelican missile equipments, including type 1N21, and type 2K28 which was the Klystron of the Pelican radar, each of which respectively determined the frequency on which each radar guidance system operated, also are specifically listed in Defendant’s Exhibit 24 as unclassified items. Insofar as is shown in the JANAR series of publications (finding 31(a), supra), none of the above-identified tubes were specifically subject to a particular security classification on the dates the equipments containing such tubes were repossessed from plaintiff by the *733 Navy. However, this does not necessarily mean that these tubes were not actually classified.
It is unnecessary for the individual component parts of a particular piece of equipment to be classified in order for the equipment, as a whole unit, to be subject to a security classification. Credible testimony was presented to that effect by the Security Officer of the Bureau of Naval Weapons who also stated in substance and relevant part that, in connection with the production of a particular weapon or weapons system, a security requirements checklist is prepared and at that time a determination is made as to whether any given component may be classified by its use in the production of the weapon or weapon system; that it is unnecessary that the components be in close physical proximity to each other; and that the mere fact that defense personnel order certain component parts, or are using them, could be a subject of classification, even though such parts are offered for sale, and purchased by members of the public.
CLASSIFICATION OF SEIZED EQUIPMENT
39. The guidance system equipments of the Pelican missile, i.e., the 136 Mark 1 Model 2, “S” Band radar receivers, Navy type CG-46ACX, and the one associated Dynamotor Power unit, CG-211078, seized from plaintiff were manufactured for the Navy Department by the General Electric Company under Contract NOrd-965. Originally the equipments were classified “Secret.” That classification was reduced to “Confidential” in January 1944, and to “Bestricted” in September 1946. The equipments remained restricted until 1953, when Executive Order 10105 abolished the “Bestricted” classification, at which time the equipments became classified “Confidential.” Thus, it is apparent that the equipments were classified “Bestricted” during the time material herein, i.e., July and August, 1950.
40. The guidance system equipments of the Bat missile, i.e., the 83 Mark 31 Model 1, “S” Band radar transmitter-receiver units, and the 81 associated PU/Mark 31 power supply units, seized from plaintiff were manufactured for the *734 Navy Department by the Western Electric Company under contract NOrd-4810. This project was originally classified “Secret.” Subsequently, that classification was reduced to “Confidential,” and it remained in the latter classification through and beyond August 1950.
RELATIONSHIP OE EqTOPMENTS INVOLVED TO THE NATIONAL Defense
41. Possession of the radar guidance and homing system of the Bat missile, i.e., the Mark 31 Model 1, “S” Band radar equipment, by a potential enemy in 1950, would have compromised the entire guidance system of said missile, and probably would have enabled such an enemy to successfully defend against the use of this weapon by developing a counter-measure system. A skilled expert in electronics engineering in possession of this equipment could reconstruct circuit diagrams and, with such diagrams, would be able to determine how the system worked and build similar circuits. Such an expert would be able to ascertain from physical examination of the guidance system, inter alia, the coding associated with transmissions, the method or technique of using this code information to track an interception target, and the tracking device which was the only one of its type in 1950. There is little doubt that possession of the equipment would have given valuable advanced technical information concerning missile guidance systems then in use not otherwise available to an unfriendly foreign power. Such a potential enemy could not have deduced the classified components of this equipment simply by viewing the pictures and descriptive data relating thereto shown in the left-hand corner of Defendant’s Exhibit 1, supra.
42. The Bat missile was an operational weapon of the United States defense arsenal during August 1950; and it was utilized for training purposes with a view on the part of the military to use the weapon in the Korean conflict. Therefore, the Bat missile system, i.e., the Mark 31 Model 1, radar equipment, including its associated PU/Mark 31 power supply unit, was a weapon related to the national defense. As noted in finding 19, supra, on or prior to August 19, 1950, the Bureau of Aeronautics of the Navy *735 Department expressed the opinion that this equipment related to the national defense within the meaning of the Espionage Act, 18 U.S.C. § 793.
43. Electronic circuits similar to those in the Pelican missile were also used in Navy missiles, such as the petrel, puppiN and the corvus. Like the guidance system of the Bat, the Pelican radar guidance system contained certain elements not found in commercial radar during 1950.
44. In August 1950, the guidance system of the Pelican missile, i.e., the Mark 1 Model 2, “S” Band radar receiver, represented an advanced state of the art probably unequalled in its capability by any other homing system then in existence, with the exception of the Bat guidance system.
45. Although the Pelican missile was not operational during 1950, possession of its guidance system would have revealed important technical information concerning the guidance systems of then operating missiles, such as the bat, petrel, pueeiN and corvus. Furthermore, its possession would have advanced the missile guidance technology of a potential enemy. Therefore, the Mark 1 Model 2, “S” Band radar receivers seized from plaintiff were related to the national defense during August 1950.
II
Damages
46. Plaintiff paid $1,600 for the PU/Mark 31 power units, $15.00 for the dynamotor power unit, and $3,162.62 for all of the articles contained in Lot 23, making a total of $4,777.62 paid by plaintiff for all of the equipments repossessed by defendant and certain other items included in Lot 23 which were not repossessed. The record does not disclose the number, or provide any basis for a finding as to the value of the scanner mounts, radar indicators, inverters, antennas and other items of equipment included in Lot 23 sold to plaintiff which were not repossessed from him by defendant. Thus, plaintiff paid a total of $4,777.62 for the equipments repossessed by defendant, less the value of the remaining equipment contained in Lot No. 23 and not repossessed by defendant. In connection with the foregoing, it should be kept in mind that at no time has the defendant *736 ever shown the value of the remaining articles in Lot 23 which were not repossessed from plaintiff, or taken the position that it is unwilling to pay the full $3,162.62, or seriously claimed that it should pay less than $3,162.62 because some of the items in Lot 23 were not repossessed.
As a result of an “all or nothing” — market value theory of recovery approach chosen by plaintiff, there is no evidence in the record with respect to costs which he may have incurred incidental to the transactions involving the equipments which the defendant repossessed. However, prior to trial the parties stipulated, inter alia, that “* * * all recitals of fact incorporated in the opinion of the Court of Claims on the respective motions of the parties for summary judgment [Dubin v. United States, 153 Ct. Cl. 550, 289 F. 2d 651 (1961)] * * * are acknowledged by the respective parties to be true and correct, except to the extent modified, altered or disclaimed in the ensuing provisions of this stipulation; * *
It was stated in Dubin v. United States, supra, at 552, that “the plaintiff negotiated with Fair Badio Sales and bought 80 power units for $1,600 and paid $173.86 freight to have them shipped to plaintiff’s warehouse in New YorhP [Emphasis supplied.]
In view of the stipulation of the parties, supra, and that the above-quoted recital of fact was not “modified, altered or disclaimed” in the ensuing provisions of said stipulation, said fact that plaintiff paid $173.86 in freight charges to have them (the 80 power units) shipped to the plaintiff’s warehouse in New York is found to be true. The amounts paid by plaintiff for the 80 power units and for the dyna-motor were paid about ten days before repossession by defendant in arm’s-length transactions between a willing buyer and a willing seller, and these amounts are found to be the market value of them when repossessed by defendant.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the *737 United States, and judgment is therefore entered for plaintiff in the amount of four thousand nine hundred fifty-one dollars and forty-eight cents ($4,951.48).

 See plaintiff’s Exhibit No. 2D.

 See 40 USC § 484, 63 Stat. 385.

 The number of said scanner mounts, indicators, inverters, antennas and units of other equipment included in Lot No. 23 is not disclosed by; the record.

 A copy of this Bulletin is in evidence as Defendant’s Exhibit No. 1.

 Finding 2f7, infra, describes the nature, characteristics, use and purpose of the bat missile.

 62 stat. 736, 737 (1948) (now 18 U.S.C. § 793 (1964)).

 This letter is in evidence as Plaintiff’s Exhibit No. 48.

 Other models listed include, inter alia, equipment named “swod Mark 1 Mod 1” and “swod Mark 1 Mod 3,” hoth of which also are shown as being classified Restricted and under the cognizance of the Bureau of Ordnance.